**COPY**

1   MOLLY M. WHITE, Cal. Bar No. 171448
    E-mail: whitem@sec.gov
2   FINOLA H. MANVELIAN, Cal. Bar No. 180681
    E-mail: manvelianf@sec.gov
3   MARSHALL SPRUNG, Cal. Bar No. 188253
    E-mail: sprungm@sec.gov
4   JUNLING MA, Cal. Bar No. 213241
    E-mail: maj@sec.gov
5

6   Attorneys for Plaintiff
    Securities and Exchange Commission
7   Rosalind Tyson, Acting Regional Director
    Michele Wein Layne, Associate Regional Director
8   5670 Wilshire Boulevard, 11th Floor
    Los Angeles, California 90036-3648
9   Telephone:  (323) 965-3998
    Facsimile:  (323) 965-3908
10

11          **UNITED STATES DISTRICT COURT**

12          **CENTRAL DISTRICT OF CALIFORNIA**

13              **SOUTHERN DIVISION**

14

15  SECURITIES AND EXCHANGE         Case No.    **SACV08-539 CJC (RNBx)**
    COMMISSION,

16              Plaintiff,          **COMPLAINT**

17      vs.

18  HENRY T. NICHOLAS III, HENRY
    SAMUELI, WILLIAM J. RUEHLE,
19  and DAVID DULL,

20              Defendants.

21

22

23      1.      This matter involves improper stock option backdating at Broadcom

24  Corporation ("Broadcom" or the "Company"), which resulted in the Company's

25  issuance of false financial statements that concealed from shareholders billions of

26  dollars in stock-based compensation expenses.  Broadcom is a technology

27  company that relied heavily on stock options to recruit and retain employees.

28

1  From June 1998 through May 2003, Broadcom systematically backdated employee
2  and officer stock options to coincide with the dates of low closing prices for the
3  Company's common stock without properly recording the compensation expenses
4  associated with such options. In January 2007, Broadcom restated its financial
5  results for the years 1998 through 2005 and reported an additional $2.22 billion in
6  net non-cash compensation expenses.

7      2.      The backdating scheme was orchestrated and carried out by
8  Broadcom's most senior executives, including defendants Henry T. Nicholas III
9  ("Nicholas"), Broadcom's co-founder and former co-chairman and chief executive
10 officer, Henry Samueli ("Samueli"), Broadcom's co-founder and current chairman
11 and chief technical officer, William J. Ruehle ("Ruehle"), Broadcom's former
12 chief financial officer, and David Dull, Broadcom's general counsel (collectively
13 "Defendants").

14     3.      Nicholas was the final decision-maker and the driving force behind
15 Broadcom's options backdating, while Ruehle selected most of the grant dates
16 after-the-fact by comparing historical prices. Nicholas and Samueli served on the
17 two-member option committee that had authority to approve options to all
18 employees and officers who were not Section 16 officers. Nicholas and Samueli
19 each signed dozens of false option committee unanimous written consents to
20 memorialize numerous backdated grants. Although Broadcom's compensation
21 committee, which consisted of two independent directors, had the legal authority to
22 approve option grants to Section 16 officers, Nicholas, Samueli, and Ruehle in
23 effect decided those grants and used hindsight to select the dates for option grants
24 to Section 16 officers. Dull knew about and participated in the fraud. He
25 instructed his subordinate to prepare, and reviewed and approved false board and
26 compensation committee documents to conceal two backdated grants in 2001.

27     4.      Nicholas, Samueli, Ruehle, and Dull violated the antifraud provisions
28 of the federal securities laws, falsified books and records, and caused Broadcom to

1  report false financial results.  The Commission seeks an order (1) enjoining the

2  Defendants from future violations of the securities laws; (2) requiring Ruehle and

3  Dull to disgorge their ill-gotten gains and pay prejudgment interest; (3) requiring

4  all Defendants to pay civil monetary penalties; (4) requiring Nicholas and Ruehle

5  to disgorge bonuses and stock sale profits pursuant to Section 304 of the Sarbanes-

6  Oxley Act; (5) barring all Defendants from serving as officers or directors of a

7  public company; and (6) providing other appropriate relief.

8                            **JURISDICTION AND VENUE**

9         5.     This Court has jurisdiction over this action pursuant to Sections 20(b),

10  20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C.

11  §§ 77t(b), 77t(d)(1), and 77v(a), and Sections 21(d), 21(e), and 27 of the Securities

12  Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.

13  Defendants have directly or indirectly made use of the means or instrumentalities

14  of interstate commerce, of the mails, or of the facilities of a national securities

15  exchange in connection with the transactions, acts, practices, and courses of

16  business alleged in this Complaint.

17        6.     Venue is proper in this district pursuant to Section 22(a) of the

18  Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C.

19  § 78aa, because Defendants resided within this district during the relevant time

20  period and certain of the transactions, acts, practices, and courses of conduct

21  constituting violations of the laws alleged in this Complaint occurred within this

22  district.

23                                  **DEFENDANTS**

24        7.     Henry T. Nicholas III, 48, is a resident of Newport Coast, California.

25  Nicholas co-founded Broadcom and served as its CEO and president from

26  Broadcom's inception in 1991 until Nicholas's resignation from those positions in

27  January 2003.  From 1991 to May 2003, Nicholas also served as a member of

28  Broadcom's board of directors, as co-chairman of the board, and as one of two

1   members of the option committee.  As of April 2008, Nicholas (together with his

2   affiliates) owned 32,189,097 shares (6.26%) of Broadcom's common stock.

3        8.     Henry Samueli, 53, is a resident of Corona del Mar, California.  He

4   co-founded Broadcom with Nicholas, and he has served as a member of

5   Broadcom's board of directors and as Broadcom's chief technical officer since

6   1991.  Samueli also served as co-chairman of the board until May 2003, and as

7   chairman since May 2003.  From 1998 to May 2003, Samueli served with Nicholas

8   on the two-member option committee, and from May 2003 to the present he has

9   served on the successor equity award committee.  As of April 2008, Samueli

10  (together with his affiliates) owned 34,700,056 shares (6.75%) of Broadcom's

11  common stock.

12       9.     William J. Ruehle, 65, is a resident of Atherton, California.  He joined

13  Broadcom in June 1997 as vice president and chief financial officer, and became

14  senior vice president and chief financial officer in April 2005.  On September 19,

15  2006, Ruehle accelerated his retirement as a result of Broadcom's internal

16  investigation of stock option grant practices.

17       10.    David Dull, 59, is a resident of Newport Coast, California.  He joined

18  Broadcom as vice president of business affairs and general counsel in March 1998,

19  and was elected corporate secretary in April 1998.  He became senior vice

20  president of business affairs, general counsel and secretary in April 2005.

21                              **RELATED PARTY**

22       11.    Broadcom Corporation is a California corporation headquartered in

23  Irvine, California.  Founded in 1991 by Nicholas and Samueli, Broadcom designs,

24  develops, and supplies semiconductors for wired and wireless communications

25  markets.  At all relevant times, Broadcom's common stock was registered under

26  Section 12(g) of the Exchange Act and was traded on the Nasdaq National Market

27  under the symbol "BRCM."  Broadcom conducted an initial public offering on

28  April 17, 1998.

# FACTS

**A.    Stock Options at Broadcom**

12.    After Broadcom went public in April 1998, it experienced tremendous growth, expanding from approximately 300 employees in 1998 to about 3000 employees in 2002.  Broadcom operated in the highly competitive high-tech market, where recruiting and retaining talented employees was a top priority.  Another priority, as set forth by Broadcom's two founders, Nicholas and Samueli, was to preserve cash.  To preserve cash, Broadcom maintained a ceiling of $110,000 annual cash salary for most employees and officers during the relevant period.  As a result, Broadcom relied heavily on stock options to recruit and retain employees.

13.    Each stock option gave the grantee the right to buy one share of Broadcom's stock from the Company at a set price, called the "exercise" price or "strike" price, on a future date, after the option had vested.  The option was "in-the-money" whenever the trading price of Broadcom's common stock exceeded the option's exercise price.  The option was "at-the-money" whenever the trading price of Broadcom's common stock and the exercise price were the same.  The option was "underwater" or "out-of-money" whenever the trading price of Broadcom's common stock was less than the exercise price.

14.    From June 1998 through May 2003, Broadcom granted both annual and periodic options to its employees and officers under its stock option plans.  Before 2000, Broadcom awarded annual grants to employees on or about the anniversary date of their employment.  Beginning in 2000, annual options were awarded to most eligible employees, and were referred to as "focal" grants.  Periodic options were also awarded to selected employees.  These option grants included new hire grants, performance and promotion grants, patent grants, and "top-up" grants that were made in connection with acquisitions.

15.    During the relevant period, Broadcom's stated practice was to grant

1    all stock options with an exercise price that purportedly matched the fair market

2    value of the Company's stock on the grant date.

3    **B.**    **Accounting For Employee Stock Options**

4          16.    Throughout the relevant period, Broadcom accounted for stock

5    options pursuant to Accounting Principles Board Opinion No. 25, *Accounting for*

6    *Stock Issued to Employees* ("APB 25"). Under APB 25 and the accounting rules in

7    effect from 1998 through June 2005), a public company was allowed to grant stock

8    options to employees without recording a compensation expense so long as the

9    options were granted at-the-money. However, if a company granted in-the-money

10    options, the company was required to record as an expense on its financial

11    statements the difference between the exercise price and the quoted market price

12    on the "measurement date" over the vesting period of the options. The

13    measurement date, as defined by APB 25, is the first date on which the following

14    information is known: (i) the number of options that an individual employee is

15    entitled to receive, and (ii) the exercise price. The stock options that Broadcom

16    granted to its employees typically had a vesting period of four years, during which

17    time a proportion of the option shares became exercisable periodically.

18    Consequently, granting in-the-money options to employees could have had a

19    significant impact on the expense and income (or loss) reported to Broadcom's

20    shareholders.

21    **C.**    **The Backdating Scheme At Broadcom**

22          17.    During the relevant period, Broadcom granted stock options to its

23    employees and officers, including executives who fell within the definition of

24    "officer" under Rule 16a-1(f) of the Exchange Act, 17 C.F.R. § 240.16a-1(f)

25    ("Section 16 officers"). Option grants to employees and non-Section 16 officers

26    were supposed to be approved by a two-member option committee comprised of

27    Nicholas and Samueli. Grants to Section 16 officers were supposed to be approved

28    by a compensation committee comprised of two independent board members.

1 | Notwithstanding the distinction between the two committees, Nicholas and
2 | Samueli in effect determined option grants for all employees, including Section 16
3 | officers.

4 |       18.    Option committee and compensation committee approval of option
5 | grants was documented by unanimous written consents ("UWCs") that approved
6 | grants "effective as of" a specified date. The UWCs, however, were usually
7 | prepared weeks or months after the "as of" date. The UWCs typically referred to
8 | an attached schedule that listed the names of the grantees and the number of shares
9 | subject to each option. The schedules were usually prepared long after the "as of"
10 | date, and they were sometimes changed even after that.

11 |       19.    For the periodic grants and focal grants that Broadcom made in 1998
12 | and 1999, the human resources and shareholder services departments maintained
13 | schedules of employees who were eligible to receive options. Beginning in 2000,
14 | for annual, company-wide focal grants, Broadcom's senior management first
15 | established a pool of options, which was then subdivided and distributed to all of
16 | the business units for allocation to their respective employees. Supervisors for the
17 | business units then submitted their grant recommendations to the then-director of
18 | human resources, who assembled the master grant list for final approval by
19 | Nicholas and Samueli.

20 |       20.    From June 1998 through May 2003, the option committee purportedly
21 | approved as many as 88 option grants. But for many of these grants, there were no
22 | option committee "meetings" or decisions made on the purported grant dates.
23 | Instead, Ruehle, who was Broadcom's CFO at the time, retroactively determined
24 | the grant dates after reviewing a list of Broadcom's closing stock prices over a
25 | ranging time period. During the relevant period, Ruehle received "menu" emails
26 | from the Company's stock administrator, in which the stock administrator provided
27 | a list of historical closing prices for several previous Fridays (the day the option
28 | committee purportedly held meetings) and inquired whether the option committee

had met and approved option grants on any of the listed dates. The "menu" emails allowed Ruehle to easily "look back" and pick the lowest strike price for the period. Ruehle invariably responded to the stock administrator's requests by confirming that the option committee had met to approve options on the date with the lowest corresponding stock price.

21.    For example, a December 17, 1999 email from the stock administrator to Ruehle reads as follows:

> REMINDER: The last option grant date you have advised us is 10/29/99.
> Friday FMVs are:
> 11/5 $149.25
> 11/12 $180.313
> 11/19 $196.50
> 11/26 $207.125
> 12/3 $207.75
> 12/10 $217.75
> 12/17 $225.313
> End of month November 11/30 was $179.063. ....
> Please let us know if and when the Option Committee met to approve grants.

Later that day, Ruehle confirmed the option committee's approval of grants on November 5 and November 30, 1999, the dates with the two lowest stock prices on the "menu" email.

22.    Ruehle continued to receive emails containing suggested historical stock prices through 2002. For example, on November 22, 2002, Ruehle received an email from Broadcom's treasurer, stating: "Attached are the pending new hire grants. There are 660,000 that we could price at $10.63 [the closing price on October 18] that would take us through 10/18, we can wait and see on the rest." Six minutes later, Ruehle responded by saying "I do believe the Option Committee did meet on 10/18...." On November 22, 2002, the price had risen to $20.64, and the $10.63 closing price on October 18th was the lowest closing price for Broadcom's stock in the interim.

23.    Ruehle selected the grant dates on behalf of Nicholas and Samueli, who, as the sole members of the option committee, signed the UWCs that falsely memorialized that options were granted "as of" the selected grant dates, even

1   though Nicholas and Samueli knew there was no option committee meeting or
2   decision to grant options on the stated dates and that the terms of the grants had not
3   been finalized on those dates.

4       24.    In addition to selecting grant dates after the fact, Broadcom, through
5   its senior officers, including Nicholas, Samueli, Ruehle, and Dull, systematically
6   allocated options to individual employees after selecting grant dates, many of
7   which had been backdated.  Broadcom's human resources staff routinely added or
8   deleted option awards after the grant date at the request of others under the guise of
9   "administrative errors."

10      25.    In June 1999, in an effort to recruit one engineer, Nicholas offered the
11  engineer backdated, in-the-money options to acquire 120,000 shares of Broadcom
12  stock at an exercise price of $88.375, which was the closing price on May 25,
13  1999.  The engineer, however, did not begin working at Broadcom until June 28,
14  1999.  On that date, Broadcom's stock closed at $118.  Nicholas backdated the
15  offer letter to reflect the desired grant date.  Nicholas also caused the human
16  resources department to falsify the engineer's personnel files to reflect the
17  backdated date.

18      26.    During 2000, Broadcom senior officers deployed a deceptive method
19  to recruit "key" employees with lucrative options – hiring through acquisition
20  targets.  Broadcom made numerous acquisitions in 2000.  The acquisition targets
21  were typically start-up companies whose stock was comparatively cheap.  Hiring
22  through such targets allowed Broadcom to promise prospective employees options
23  to purchase the target's stock that, once the acquisition was completed, would be
24  enormously in-the-money.  Broadcom directed the acquisition target to hire
25  Broadcom's candidates on Broadcom's terms after the signing of a definitive
26  agreement.  Because the new hires never really worked for the target company,
27  employment and personnel records were falsified to effect the hiring and granting
28  of options by the target.  Nicholas, Ruehle, Samueli, and Dull all knew about this

1   deceptive practice.  Samueli advocated this approach for several potential key

2   employees.

3        27.    One example of the deceptive practice involved the hiring of

4   Broadcom's chief information officer in August 2000.  On August 9, 2000,

5   Broadcom signed an agreement to acquire a start-up company called Newport

6   Communications, Inc. ("Newport").  At the same time that Broadcom was

7   negotiating the acquisition, Broadcom had been trying to recruit a candidate for the

8   position of chief information officer at Broadcom.  To make Broadcom's

9   compensation package attractive to the recruit, Ruehle offered the candidate

10  options in Newport stock which, upon completion of the acquisition, would be

11  in-the-money by $12 million.  The candidate accepted the offer, and received an

12  August 25, 2000 offer letter from Newport that included options to acquire

13  600,000 shares of Newport stock.  The recruit, however, never worked for

14  Newport, and reported directly to Broadcom.  By bringing in the candidate through

15  Newport, Broadcom concealed the grant of a large amount of in-the-money options

16  to the new hire.  Although Broadcom recorded an expense for the options that the

17  new hire had received from Newport, the expense was recorded as acquisition-

18  related deferred compensation, and not as a compensation expense associated with

19  in-the-money options.

20  **D.    The May 26, 2000 Focal Grant**

21       28.    Broadcom made its first company-wide, or "focal," grant purportedly

22  on May 26, 2000, at an exercise price of $118.38 per share, the lowest closing

23  price for Broadcom stock between October 1999 and October 2000.  The May 26,

24  2000 grant date was selected on or about May 30, 2000.  In May of 2000, however,

25  Broadcom was not prepared to make the company-wide focal grant.  In mid-June

26  of 2000, the Company hired its first director of compensation, who developed the

27  guidelines and spreadsheets for options allocations at the end of June 2000.  In

28  early July, pools of options were distributed to all business units for individual

1   allocations, but the allocations were not completed until early to mid-September.

2   Between September of 2000 and January of 2002, the human resources department

3   recorded numerous changes to the allocations, under the guise of "administrative

4   errors."

5        29.    The allocation delay caught the attention of Broadcom's auditors in

6   late July 2000, when Broadcom's stock price had risen from $118 per share to well

7   over $200. The price difference exposed Broadcom to a potential $700 million

8   compensation expense for the focal grant. On July 20, 2000, Broadcom's manager

9   of financial reporting, who was the primary contact with the auditors, informed

10   Ruehle of the auditors' concern. She said:

11       As expected, I am experiencing resistance from [the auditors] on our Focal
    Grant program. The basic concern is the measurement date of these grants
12       (5/26/00). ...
    [The auditors'] position is that we need to know how many shares are
13       granted to each individual to actually set the measurement date. ...[auditors]
    could require us to record compensation expenses...[which] could be over
14       $700 million based on the 5/26/00 price and the current price!

15   On the same date, Ruehle emailed Nicholas, stating: "We need to give to [auditors]

16   a list of approved option grants for the 5/26 focal reviews. They are making noises

17   that we will have to take a compensation hit for the difference between the 5/26

18   price ($118) and the current price because we have not yet 'completed' the grants.

19   This would result in a charge of over $700M! Obviously we are not about to let

20   this happen."

21        30.    Subsequently, Ruehle had a meeting with the auditors, and

22   presumably discussed the issue with the relevant partners at the audit firm. In the

23   end, the auditors signed off on the May 26, 2000 grant without insisting that

24   Broadcom record a compensation charge. In a September 11, 2000 email to

25   Ruehle, Broadcom's manager of financial reporting warned that: "Going forward,

26   we can expect much greater scrutiny by [the auditors] on our option granting

27   process. I strongly recommend for next year's focal grant that we have all the

28   names and numbers ready before we select a price date. I do not believe that [the

auditors] will grant us any flexibility on this in the future." On that same day, Ruehle forwarded the email to other senior officers, including Nicholas, Samueli, and Dull. Consequently, by September 2000, Nicholas, Samueli, Ruehle, and Dull knew, or were reckless in not knowing, that allocating options to individual employees after a grant date had been determined would trigger accounting consequences.

31.   In late July 2000, at Ruehle's request, Broadcom's stock administrator prepared draft minutes for a purported option committee meeting on May 26, 2000, at which the option committee purportedly set up an option pool of seven million shares for the grant. The draft minutes were later sent to Dull, although the minutes were never finalized or signed. Rather, the approval of the grant was documented only by UWCs for the option committee and the compensation committee, dated "as of" May 26, 2000. The compensation committee members first heard of the grant when Dull sent them the draft UWC on September 23, 2000.

32.   As a result of the May 26, 2000 grant, Ruehle received options to purchase 100,000 shares, and Dull received options to purchase 150,000 shares, of Broadcom stock.

**E.   The 2001 Grants**

   **1.   Background**

33.   In late 2000, Broadcom's stock price began declining steadily and was trading at about $30 per share in March 2001. As a result, many employees' stock options became "underwater," which means that the trading price of Broadcom's stock was lower than the exercise price. The underwater options had a negative impact on employee morale because Broadcom paid below-the-market cash salaries and relied heavily on stock options to make its compensation package competitive. To address employee concerns, Broadcom commenced a tender offer in May 2001.

1       34.    The tender offer allowed employees to exchange their underwater

2 options for new options to be issued between December 24, 2001 and January 31,

3 2002.  Employees had to decide whether to take part in the tender offer by June 23,

4 2001.  Broadcom undertook to allocate proposed focal grants to employees before

5 the tender offer closing date of June 23, 2001, so that employees knew how many

6 options they would receive from the 2001 focal grant if they decided not to

7 participate in the tender offer.  For those employees who declined to participate in

8 the tender offer, Broadcom granted focal and other options on Sunday, June 24,

9 2001, with the exercise price of $33.68, which was the closing price of

10 Broadcom's stock on the previous Friday, June 22, 2001.

11       35.    At the time of the June 24, 2001 grant, Nicholas had not completed

12 the allocations of options to his direct reports.  In fact, Nicholas had delayed for

13 months in submitting his allocations.  Consistent with prior practices, however, the

14 June 24 grant date was "preserved" for Nicholas by the director of human

15 resources.  In September of 2001, Broadcom's stock price dropped below the June

16 24 exercise price of $33.68, and the June 24 grant date was abandoned.

17       36.    Broadcom made two additional focal grants to employees and officers

18 who declined to participate in the tender offer.  Those two additional focal grants

19 had purported grant dates of October 1 and October 19, 2001.  Broadcom then

20 granted replacement and focal options to those employees and officers who

21 participated in the tender offer with a purported grant date of December 24, 2001.

22       **2.**    **October 1, 2001 Grant**

23       37.    Around November 2, 2001, the stock administrator sent an email to

24 the director of human resources advising that Ruehle had confirmed an option

25 committee meeting approving options on October 1, 2001 at the strike price of

26 $18.77, the lowest price for Broadcom stock in 2001.  Later in November 2001,

27 Nicholas decided to seize the low $18.77 price to grant special stock options to two

28 groups of employees: (i) top performers, and (ii) those employees whose existing

1   options would be fully vested in the next two years.  From mid-November to early
2   December 2001, at Nicholas's urging, Samueli and the director of human resources
3   analyzed the status of employee options and worked with the business units to
4   identify the recipients of such grants.

5       38.     On January 2, 2002, Nicholas finally sent the director of human
6   resources a spreadsheet of his option allocations in an email with a subject line that
7   read: "I found my old share grant spreadsheet from before October."  The
8   spreadsheet, however, was first created on November 27, 2001.  Nicholas
9   continued to review and change his allocations through at least January 21, 2002.
10  As late as March 22, 2002, Nicholas awarded several options at the $18.77 price.

11      **3.     October 19, 2001 Grant**

12      39.     Nicholas's spreadsheet included option grants to several Section 16
13  officers who were also supposed to receive the October 1 grant at an exercise price
14  of $18.77.  At the time, Ruehle and the director of human resources expressed
15  concern that employees would resent officers receiving the lower strike price of
16  $18.77, when the rank and file employees received the June 24 price of $33.68.
17  They therefore proposed to grant options to Section 16 officers with the same
18  October 1, 2001 grant date but at the June 24, 2001 price of $33.68.  Nicholas
19  disagreed.

20      40.     On January 3, 2002, the director of human resources emailed Samueli,
21  Ruehle, and Dull, stating that Nicholas "would like to find another opportunistic
22  date, say $25.55 on 10/5 or $29.25 on 10/19."  This was the first mention of
23  October 19, 2001 as a possible grant date for the Section 16 officers.  Nine minutes
24  later Samueli responded to the group, "OK, then go with the 10/19 price."

25      **4.     December 24, 2001 Grant**

26      41.     Meanwhile, the tender offer's six-month-and-a-day waiting period
27  ended.  Broadcom had from December 24, 2001 to January 31, 2002 to re-grant
28  options to those employees who had participated in the tender offer.  At the end of

December 2001, the senior officers, including Nicholas, Samueli, and Ruehle, deliberated on when to grant the options. Dull knew the senior officers were deliberating about a grant date. On December 30, 2001, the director of human resources emailed Ruehle, informing him that Nicholas "made a big deal" on when to re-grant options:

> He asked me if we could wait until the end of January to see what happens, but if the best price was Dec. 24, could we go back and grab it?? I really couldn't answer since we are crossing years, so my understanding was that he was trying to get a hold of you to find out before he would give me the list. Did you speak with him??

Ruehle responded on January 1, 2002 that "[T]he deadline for grabbing the 12/24 pricing date is Jan 5."

42.    On January 4, 2002, Ruehle sent an email to Nicholas and Samueli, copying Dull, the director of human resources and others on the email:

> I VERY strongly recommend that these options be priced as of Dec 24 ($39 & change). The absolute drop dead for this decision is Friday Jan 4. If there are no objections I would like to go ahead and price as of that date…. Given the recent market performance, I think that we should grab the Dec 24 price.

Samueli responded five minutes later, saying: "I agree. We may not see the $39.75 price again before Jan. 31. It would be far too risky to wait and see."

43.    Later that day, the director of human resources confirmed to Samueli and Ruehle that the option and compensation committees had approved the re-grant on December 24, 2001. Nicholas was copied on the confirmation. Dull later received a copy of the confirmation email forwarded by an in-house attorney under his supervision. Nicholas, Samueli, Ruehle, and Dull all knew that the date was selected retroactively. Consistent with past practice, Nicholas and Samueli signed a backdated option committee UWC approving the grant "as of" December 24, 2001.

44.    The December 24, 2001 closing stock price of $39.75 was the lowest closing price for Broadcom stock during the entire re-grant window.

1

## 5.   False Documentation of Grants to Section 16 Officers

2        45.     Of the four grants in 2001, the purported June 24, October 19, and

3   December 24 grants included option grants to Section 16 officers and therefore

4   required the approval of the compensation committee.  There was no meeting of

5   the compensation committee to approve the June 24, October 19, and December 24

6   grants on the purported grant dates.  The compensation committee was not

7   constituted for the period that would have covered the October 19 and December

8   24 grants.

9        46.     At the time of the June 24, 2001 grant, the compensation committee

10   was comprised of two members.  One of those members died in July 2001, before

11   signing any UWC approving the June 24 grant.  In early January 2002, upon Dull's

12   request and in an effort to supply the missing documentation, an in-house lawyer

13   under Dull's supervision prepared draft minutes for a "special telephonic meeting"

14   of the compensation committee on June 24, 2001.  The in-house lawyer sent the

15   draft minutes to Dull and others for review.  Dull never signed the draft minutes in

16   his capacity as corporate secretary.  Hence, there was no compensation committee

17   approval of the June 24, 2001 grant to Section 16 officers.  Nevertheless, the draft

18   minutes were provided to Broadcom's external auditors and were included in their

19   workpapers as draft meeting minutes of the compensation committee.

20        47.     After the board member's death, Broadcom's board of directors

21   consisted of Nicholas, Samueli, and two outside directors, one of whom was

22   already a member of the compensation committee.  Beginning in September 2001,

23   Dull led the effort to resolve the vacancy issue.  He first directed the in-house

24   attorney under his supervision to find out whether the compensation committee

25   needed two members and who could serve.  The in-house lawyer advised Dull that

26   at least two independent members were required.  That left the other outside

27   director as the sole choice to replace the deceased member of the compensation

28   committee.

48.     The board met on October 19, 2001, during which Dull reported on the board vacancy.  The board did not make any decision about the vacancy at that time.

49.     On November 4, 2001, Dull emailed Nicholas and Samueli.  In the email, Dull advised them on the need to constitute the compensation committee, explained why neither of them could serve, and asked for approval to add the other outside director to the compensation committee.  Samueli immediately responded yes, but Nicholas never responded.  On December 21 and again on December 28, 2001, Dull asked Ruehle to "get closure" so the Company could prepare for the re-grant of options to Section 16 officers – including himself – after the tender offer. Dull later followed up with Nicholas on January 3, 2002, urging him to act since it "affected our ability to make option grants to Sec 16 officers."  Again, Dull received no response.

50.     In the meantime, Dull instructed the in-house attorney to prepare for distribution the board UWC appointing the other outside director.  The attorney prepared the draft and sent it to Dull, asking what date should be reflected in the UWC.  Dull reviewed the draft and told the attorney to "[l]eave the date blank." Dull also asked the attorney to prepare compensation committee UWCs approving grants to Section 16 officers.  On January 3, 2002, Dull received from the attorney a draft UWC approving a grant to Section 16 officers dated as of October 1, 2001, but at the June 24th price of $33.68.  On January 7, 2002, Dull received from the attorney another two compensation committee UWCs approving grants to Section 16 officers, this time dated October 19, 2001 and December 24, 2001.  Dull reviewed and approved these UWCs.

51.     On February 27, 2002, at Dull's request, the in-house attorney emailed Ruehle to ask when the other outside director was appointed to the compensation committee.  Ruehle provided a date of October 12, 2001.

52.     During a meeting of the board of directors on March 1, 2002, the

1  board members were presented with, and signed, a UWC appointing the other

2  outside director to the compensation committee "as of" October 12, 2001.  At the

3  same meeting, the members of the compensation committee, including the newly

4  appointed member, were presented with and signed UWCs dated "as of" October

5  19 and December 24, 2001, which approved option grants on those dates.

6      53.    Ruehle and Dull participated in the June 2001 tender offer and each

7  received options to purchase 300,000 shares of Broadcom stock from the

8  December 24, 2001 grant.

9  **F.    2002/2003 Focal Grants on July 3, 2002**

10     54.    In March 2002, Broadcom's stock price began a steady decline.  The

11 2002 focal grant process had started in the spring of 2002.  By mid-May, the

12 director of human resources sent several emails stating that the option committee

13 had met and approved focal grants on May 10, 2002 at an exercise price of $24.54,

14 then the lowest price since October 2001.  After the stock price dropped even

15 further, Ruehle instructed the director of human resources to retract the May 10,

16 2002 grant date.

17     55.    In mid-June 2002, Samueli suggested that Broadcom take advantage

18 of "a favorable strike price" and grant 2003 focal options at the same time as the

19 2002 grant, hence making it a "double focal" grant.  Ruehle "killed" the proposal

20 in early July because of the dilutive impact (of more than 31 million shares) that a

21 "double focal" grant would have on Broadcom's stock.  The director of human

22 resources appealed to Samueli, and Samueli "revived" the double focal grant in

23 mid-July.

24     56.    Broadcom awarded the "double focal" option grant purportedly on

25 July 3, 2002 at an exercise price of $15.74.  Ruehle retroactively selected the July

26 3, 2002 date on or about July 16, 2002.  The July 3, 2002 price of $15.74 was the

27 second lowest closing price for Broadcom's stock between January 1, 2002 and

28 September 5, 2002.

57.     Allocation of the 2003 focal portion of the grant was rolled out to business units on or after July 16, 2002. After that time, except for a few units and Nicholas's direct reports, Broadcom's business unit heads, including Dull, submitted their allocations of options for their subordinates, although the human resources department continued to process changes through at least August 7, 2002. During this period, the director of human resources complained that she had to meet in person with all the business units about the allocation because Ruehle did not want her to "communicate anything in writing since it would leave an email trail of unfavorable dates."

58.     The July 3, 2002 grant did not include Nicholas's "direct reports," because Nicholas's option allocations did not arrive until July 26, 2002. By that time, however, the July 3 grant date had been surrendered for these employees. On August 5, 2002, Broadcom's stock closed at $15.74, which was exactly the same closing price as on July 3, 2002. The next day, Ruehle priced options for Nicholas's direct reports, including several Section 16 officers, at the August 5, 2002 price of $15.74. Previously, on July 30, 2002, when Broadcom's stock closed at $19.65, Ruehle had advised that the compensation committee had approved a grant to Section 16 officers on July 26, 2002 at the price of $17.38. Ruehle abandoned the July 26 date when a more favorable price appeared on August 5, 2002 at $15.74.

59.     The compensation committee did not approve the grant on August 5, 2002, and its members did not learn of that grant until late September 2002, when they were asked to execute a UWC dated "as of" August 5, 2002.

60.     Ruehle received options to purchase 300,000 shares, and Dull received options to purchase 200,000 shares, of Broadcom stock from the August 5, 2002 grant.

## G.     The May 19, 2003 Focal Grant

61.     Broadcom granted focal options to newly hired employees who did

1    not participate in the 2002/2003 "double focal" grant with a purported grant date of

2    May 19, 2003 at an exercise price of $20.00.  The director of human resources

3    communicated the May 19, 2003 grant date to the stock administrator, although the

4    director of human resources did not seek the approval of the grant until June 5,

5    2003, when the closing price of Broadcom's stock was $26.66.  Dull did not

6    provide the director of human resources with the allocations of options for his

7    subordinates until after May 19, 2003.  Dull also knew that there was no approval

8    of the grant on May 19, 2003.

9    **H.    Defendants Caused Broadcom to File Materially False and Misleading**

10           **Financial Statements and Other Filings**

11           62.    As a public company, Broadcom filed with the Commission periodic

12    reports and other filings, including annual reports that included audited financial

13    statements, which were certified by the Company's outside auditors.  Broadcom's

14    public filings stated that Broadcom accounted for its stock option grants to

15    employees in accordance with generally accepted accounting principles, or GAAP.

16    GAAP requires that a company recognize a compensation expense when the

17    company issues in-the-money stock options.

18           63.    From June 1998 through May 2003, by repeatedly backdating its

19    option grants, Broadcom granted in-the-money options, but Broadcom did not

20    record a compensation expense for such options.  As a result, Broadcom made

21    false and misleading disclosures regarding its operating results and option grants in

22    its public filings, including its periodic reports on Forms 10-K, 10-Q, and 8-K, its

23    proxy statements, and its registration statements.

24           64.    Nicholas, Samueli, Ruehle, and Dull reviewed and/or signed the

25    public filings.  Nicholas, Samueli, Ruehle, and Dull knew, or were reckless in not

26    knowing, that Broadcom's public filings made materially false and misleading

27    statements relating to Broadcom's stock-based compensation charge and its

28    practices for granting employee stock options.

1   **1.   Forms 10-K, 10-Q, and 8-K**

2   65.   The backdating scheme caused each of Broadcom's annual reports on

3   Form 10-K for fiscal years 1998 through 2003, and each of its quarterly reports on

4   Form 10-Q for the same period, to materially understate Broadcom's stock-based

5   compensation expenses.  This, in turn, caused Broadcom to overstate its net

6   income or to understate its net loss, and to overstate its earnings per share and

7   profit margin.  Broadcom's Forms 10-K and 10-Q for fiscal years 2004 and 2005

8   contain materially false and misleading financial statements and results because, in

9   part, they contain, to varying degrees, materially false and misleading historical

10   financial statements from fiscal years 1998 through 2003.  Broadcom's materially

11   misstated operating results also were featured in Broadcom's earnings releases to

12   the market, which were filed with the Commission in Forms 8-K during the

13   relevant period.

14   66.   On January 23, 2007, Broadcom restated its financial results for the

15   years 1998 through 2005 to record an additional $2.22 billion of net non-cash

16   compensation expense associated with backdated stock options.  The impact of the

17   restatement on Broadcom's operating income during the relevant period was as

18   follows:

19

| Fiscal Year Ended 12/31 | Broadcom's Operating Income (Loss) As Originally Stated | Unrecognized Compensation Expense | Percentage By Which Operating Income (Loss) Was Overstated (Understated) |
|---|---|---|---|
| 1998 | $35,660,000 | $11,770,000 | 49.3% |
| 1999 | $92,653,000 | $74,927,000 | 422.7% |
| 2000 | ($713,381,000) | $442,326,000 | (38.3%) |
| 2001 | ($2,790,921,000) | $916,879,000 | (24.7%) |
| 2002 | ($1,918,415,000) | $374,337,000 | (16.3%) |
| 2003 | ($967,619,000) | $334,006,000 | (25.7%) |
| 2004 | $272,025,000 | $65,085,000 | 31.5% |
| 2005 | $336,837,000 | $44,640,000 | 15.3% |
| Total | ($5,653,161,000) | $2,263,970,000 | (28.6%) |

26   67.   Broadcom's failure to account for compensation expenses associated

27   with the granting of stock options led Broadcom to overstate its gross profit by

28   13% for 2001, 4% for 2002, and 4% for 2003.  The Company's failure to account

for compensation expenses also caused Broadcom to understate its net loss per share (basic and diluted) by 25% for 2001, 20% for 2002, and 26% for 2003, and to overstate its net income per share by 28% (basic) or 27% (diluted) for 2004, and 13% (basic) or 11% (diluted) for 2005.

68.     In addition, in its annual and quarterly reports on Forms 10-K and 10-Q for fiscal year 2000, Broadcom reported compensation expenses for the options that Broadcom's acquisition targets granted to new-hires at Broadcom's direction and on its behalf.  The Forms 10-K and 10-Q, however, did not disclose Broadcom's deceptive practice of hiring through the acquisition targets.  The Forms 10-K and 10-Q also falsely reported the compensation liability as acquisition-related deferred compensation, not as compensation expense associated with in-the-money options.

69.     From 1998 through 2002, Nicholas reviewed and signed Broadcom's Forms 10-K and 10-Q.  From 1998 through 2005, Samueli reviewed and signed Broadcom's Forms 10-K and 10-Q.  From 1998 through 2005, Ruehle caused to be prepared Broadcom's Forms 10-K and 10-Q, and he reviewed and signed them.  From 1998 through 2005, Dull caused to be prepared and reviewed Broadcom's Forms 10-K and 10-Q.  Nicholas, Samueli, Ruehle, and Dull knew, or were reckless in not knowing, that the disclosures in the Forms 10-K and 10-Q that they reviewed and/or signed made false representations and failed to report Broadcom's stock option compensation expenses.

70.     From 1998 through 2005, Ruehle and Dull caused to be prepared and reviewed Broadcom's Forms 8-K containing Broadcom's earnings releases.  Ruehle also signed the Forms 8-K.  Ruehle and Dull knew, or were reckless in not knowing, that the disclosures in the Forms 8-K they reviewed and/or signed failed to report Broadcom's stock option compensation expenses.

71.     Nicholas signed a Sarbanes-Oxley Section 302 certification for the Form 10-Q for the quarter ended September 30, 2002, in which he certified that the

1  financial statements contained therein "fairly present in all material respects the

2  financial condition [and] results of operations" of Broadcom.  At the time he

3  signed the certification, Nicholas knew it was not true.

4        72.    Ruehle signed Sarbanes-Oxley Section 302 certifications for the

5  Forms 10-K and Forms 10-Q from November 2002 through 2005, in which he

6  certified that the financial statements contained therein "fairly present in all

7  material respects the financial condition [and] results of operations" of Broadcom.

8  At the time he signed the certifications, Ruehle knew that they were not true.

9        **2.**    **Proxy Statements**

10        73.    Broadcom sent shareholders proxy statements in connection with its

11  annual shareholder meetings from 1999 through 2003, and for a special

12  shareholder meeting in October 1999.  In the proxy statements for the shareholder

13  meetings for the years 2001 through 2003 and for the 1999 special shareholder

14  meeting, Broadcom solicited shareholder approval of annual amendments to its

15  1998 Incentive Stock Plan to increase the number of shares reserved for issuance

16  under the Plan.

17        74.    Each of the proxy statements that Broadcom sent its shareholders

18  falsely represented that options to its executive officers were granted at the market

19  price on the date of the grant.  The proxy statements for the shareholder meetings

20  for the years 2001 through 2003 and for the 1999 special shareholder meeting

21  falsely disclosed the date of option grants to Broadcom's named executive officers,

22  which were incorporated by reference into the Company's annual reports on Form

23  10-K.  The proxy statements also represented that the compensation committee had

24  exclusive authority to grant options to Section 16 officers, when in fact Nicholas,

25  Samueli, and Ruehle decided when and how many options to award.  In addition,

26  while the proxy statements described that granting in-the-money options would

27  result in the Company taking a compensation expense, the proxy statements were

28  materially misleading because they failed to disclose that Broadcom routinely

1  ignored this treatment of its stock options.

2      75.    Dull signed the proxy statements on behalf of Broadcom's board.
3  Nicholas signed the letter to shareholders that was enclosed with the proxy
4  statements for 1999 and 2000.  Ruehle was one of the two proxies appointed in
5  connection with the proxy solicitations between 1999 and 2005.  Nicholas, Ruehle,
6  and Dull knew, or were reckless in not knowing, that they made materially false
7  and misleading statements and disclosures in the proxy statements that they
8  reviewed and/or signed.

9          3.    **Registration Statements**

10     76.    From June 1998 through 2005, Broadcom filed various registration
11 statements with the Commission, including one on Form S-1, four on Forms S-3,
12 one on Form S-4, and 21 on Forms S-8.  These registration statements were filed
13 primarily in connection with Broadcom's acquisitions of other companies.  These
14 registration statements included and/or incorporated by reference the consolidated
15 financial statements and the misrepresentations in Broadcom's Forms 10-K, 10-Q,
16 and 8-K, and Broadcom's proxy statements for the same period.  In addition,
17 Broadcom conducted tender offers in 2001 and 2003.  The tender offer documents
18 contained misleading statements regarding the 1998 Stock Option Plan.  In
19 particular, the tender offer documents described that in-the-money options granted
20 pursuant to the Plan would result in the Company taking a compensation expense,
21 but they did not disclose that Broadcom routinely ignored that treatment of its
22 stock options.  The tender offer documents also incorporated the false financial
23 statements included in Broadcom's Forms 10-K for the period.

24     77.    Nicholas reviewed and signed the registration statements from 1998
25 through 2002.  Samueli and Ruehle reviewed and signed the registration statements
26 from 1998 through 2005.  Ruehle and Dull caused the registration statements to be
27 prepared, and they reviewed them.  Nicholas, Samueli, Ruehle, and Dull knew, or
28 were reckless in not knowing, that the registration statements that they reviewed

1   and/or signed contained and/or incorporated by reference materially false and
2   misleading statements and disclosures.

3   **4.    Misrepresentation to Auditors by Nicholas and Ruehle**

4   78.    Nicholas and Ruehle misled Broadcom's outside auditors in an
5   attempt to hide their backdating scheme at Broadcom.

6   79.    In their capacity as Broadcom's CEO and CFO, Nicholas and Ruehle
7   signed management representation letters to Broadcom's auditors in connection
8   with their audits of Broadcom's periodic reports and other filings.  Nicholas signed
9   the management representation letters from 1999 through 2002, and Ruehle signed
10  the management representation letters from 1999 through 2005.  These letters
11  falsely represented that Broadcom's financial statements were presented in
12  conformity with GAAP, and that there had been no fraud involving management or
13  employees who had significant roles in internal controls.  The management
14  representation letters between August 2002 and May 2003 included false
15  information concerning the dates of UWCs for the option and compensation
16  committees.  In addition, the representation letter dated March 15, 2002 contains a
17  false option grant date.

18  80.    Nicholas and Ruehle knew, or were reckless in not knowing, that they
19  made materially false and misleading statements in the management representation
20  letters provided to Broadcom's auditors.

21  **5.    False Books and Records at Broadcom**

22  81.    During the period from June 1998 through May 2003, Nicholas and
23  Samueli signed false option committee UWCs for backdated grants.  During that
24  same period, Ruehle provided false grant dates and facilitated the false
25  documentation of grant dates.  Nicholas and Samueli also signed a backdated board
26  UWC replacing a compensation committee member in order to conceal the
27  backdating of the purported October 19 and December 24, 2001 grants to Section
28  16 officers.  Dull directed a subordinate to prepare, and Dull reviewed and

1    approved the false board and compensation committee UWCs in order to conceal

2    the backdating of the purported October 19 and December 24, 2001 grants.  All

3    Defendants knew that the backdated UWCs were relied upon by employees in

4    Broadcom's finance and shareholder services departments to record option grants

5    into Broadcom's books and records, and to prepare Broadcom's financial results

6    and public filings.

7        82.    Broadcom, as directed by Ruehle, also provided the false

8    documentation of stock option grants to Broadcom's external auditors in

9    connection with their audits of Broadcom's financial statements.  Nicholas and

10   Ruehle knew that the documentation was provided to the external auditors and

11   provided false management representation letters to the auditors.

12       83.    In June 1999, Nicholas falsified an offer letter and directed the

13   falsification of personnel records in order to conceal the fact that Broadcom

14   granted backdated options to a newly hired employee.

15       84.    As a result of the misconduct of Nicholas, Samueli, Ruehle, and Dull,

16   Broadcom's books and records falsely and inaccurately reflected, among other

17   things, the dates of option grants, the Company's stock-based compensation

18   expenses, the Company's operating results, and at least one employee's hire date.

19   Additionally, Nicholas, Samueli, and Ruehle knowingly circumvented internal

20   accounting controls and, together with Dull, failed to maintain a system of internal

21   accounting controls sufficient to provide assurances that stock option grants were

22   recorded as necessary to permit the proper preparation of financial statements in

23   conformity with GAAP.

24   **I.    Defendants Concealed the Backdating Scheme and Benefited From the**

25   **Fraud**

26       85.    The backdating scheme, among other things, allowed Defendants to

27   (i) disguise the fact that Broadcom was paying higher compensation to executives

28   and employees by awarding them in-the-money options, and (ii) avoid having to

record the in-the-money portion of backdated options as a compensation expense and thus avoid reducing the Company's net income, profit margin, and earnings per share. Keeping the scheme secret also hid the injury to Broadcom and its shareholders, which occurred when the executives and employees exercised the options and made capital contributions to Broadcom that were less than the executives and employees would have paid if the options had not been granted in-the-money.

86. Nicholas, Samueli, Ruehle, and Dull knew that Broadcom submitted materially false and misleading filings with the Commission that concealed the fact that it granted in-the-money options and did not record any compensation expenses associated with such options. Nicholas and Ruehle also made false statements and representations to Broadcom's auditors in connection with the auditors' review of Broadcom's public filings.

87. Ruehle and Dull filed false Forms 5 with the Commission, which misreported the grant dates of stock options each of them received, the expiration dates of those options, and their exercise prices. Ruehle and Dull knew that materially false and misleading disclosures were made in the Forms 5 that each filed.

88. Ruehle and Dull personally benefited from the option backdating scheme because they each received backdated options that were in-the-money by approximately $21.6 million and $24.4 million, respectively. Ruehle exercised some of his backdated options and reaped tangible financial benefits in the amount of $102,967. Dull exercised some of his backdated options and reaped tangible financial benefits in the amount of $1,862,708. Ruehle also received bonuses from Broadcom in 2005 and 2006. Those bonuses were based in part on Broadcom's positive financial performance.

# FIRST CLAIM FOR RELIEF

## FRAUD IN THE OFFER OR SALE OF SECURITIES

### Violations of Section 17(a) of the Securities Act

### (Against All Defendants)

89.     The Commission realleges and incorporates by reference ¶¶ 1 through 88 above.

90.     Nicholas, Samueli, Ruehle, and Dull, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails:

        a.    with scienter, employed devices, schemes, or artifices to defraud;

        b.    obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        c.    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

91.     By engaging in the conduct described above, Nicholas, Samueli, Ruehle, and Dull violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

1

## SECOND CLAIM FOR RELIEF

2

## FRAUD IN CONNECTION WITH THE

3

## PURCHASE OR SALE OF SECURITIES

4

### Violations of Section 10(b) of the Exchange Act

5

### and Rule 10b-5 thereunder

6

### (Against All Defendants)

7       92.     The Commission realleges and incorporates by reference ¶¶ 1 through

8    88 above.

9       93.     Nicholas, Samueli, Ruehle, and Dull, and each of them, by engaging

10   in the conduct described above, directly or indirectly, in connection with the

11   purchase or sale of a security, by the use of means or instrumentalities of interstate

12   commerce, of the mails, or of the facilities of a national securities exchange, with

13   scienter:

14              a.     employed devices, schemes, or artifices to defraud;

15              b.     made untrue statements of a material fact or omitted to state a

16                     material fact necessary in order to make the statements made,

17                     in the light of the circumstances under which they were made,

18                     not misleading; or

19              c.     engaged in acts, practices, or courses of business which

20                     operated or would operate as a fraud or deceit upon other

21                     persons.

22       94.     By engaging in the conduct described above, Nicholas, Samueli,

23   Ruehle, and Dull violated, and unless restrained and enjoined will continue to

24   violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5

25   thereunder, 17 C.F.R. § 240.10b-5.

26

27

28

# THIRD CLAIM FOR RELIEF

## FRAUD IN CONNECTION WITH THE

## PURCHASE OR SALE OF SECURITIES

### Aiding and Abetting Violations of Section 10(b) of the Exchange Act

### and Rule 10b-5 thereunder

### (Against Dull)

95.     The Commission realleges and incorporates by reference ¶¶ 1 through 88 above.

96.     By engaging in the conduct described above, Broadcom, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

      a.     employed devices, schemes, or artifices to defraud;

      b.     made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

      c.     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

97.     Dull knowingly provided substantial assistance to Broadcom's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

98.     By engaging in the conduct described above, Dull aided and abetted Broadcom's violations, and unless restrained and enjoined will continue to aid and abet violations, of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## FOURTH CLAIM FOR RELIEF

## PROXY VIOLATIONS

### Violations of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder

### (Against Nicholas, Ruehle, and Dull)

99. The Commission realleges and incorporates by reference ¶¶ 1 through 88 above.

100. Nicholas, Ruehle, and Dull, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, knowingly, recklessly or negligently, solicited proxies by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing statements which, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, or omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct statements in earlier communications with respect to the solicitation of the proxy for the same meeting or subject matter which was false or misleading.

101. By engaging in the conduct alleged above, Nicholas, Ruehle, and Dull violated, and unless restrained and enjoined will continue to violate, Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 thereunder, 17 C.F.R. § 240.14a-9.

## FIFTH CLAIM FOR RELIEF

## FALSIFICATION OF RECORDS

### Violations of Section 13(b)(5) of the Exchange Act

### and Rule 13b2-1 thereunder

### (Against All Defendants)

102. The Commission realleges and incorporates by reference ¶¶ 1 through 88 above.

103. Nicholas, Samueli, Ruehle, and Dull, directly or indirectly, falsified or

1 | caused to be falsified Broadcom's books, records and accounts subject to Section

2 | 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A).

3 | 104.   By engaging in the conduct alleged above, Nicholas, Samueli, Ruehle,

4 | and Dull violated, and unless restrained and enjoined will continue to violate,

5 | Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1

6 | thereunder, 17 C.F.R. § 240.13b2-1.

### SIXTH CLAIM FOR RELIEF

### FALSE STATEMENT TO THE ACCOUNTANTS

### Violations of Exchange Act Rule 13b2-2

### (Against Nicholas and Ruehle)

11 | 105.   The Commission realleges and incorporates by reference ¶¶ 1 through

12 | 88 above.

13 | 106.   Nicholas and Ruehle, directly or indirectly, (i) made, or caused to be

14 | made, materially false or misleading statements or (ii) omitted to state, or caused

15 | others to omit to state, material facts necessary in order to make statements made,

16 | in light of the circumstances under which they were made, not misleading, to an

17 | accountant in connection with an audit, review or examination of financial

18 | statements or the preparation or filing of a document or report required to be filed

19 | with the Commission.

20 | 107.   By engaging in the conduct alleged above, Nicholas and Ruehle

21 | violated, and unless restrained and enjoined will continue to violate, Exchange Act

22 | Rule 13b2-2, 17 C.F.R. § 240.13b2-2.

### SEVENTH CLAIM FOR RELIEF

### FALSE CERTIFICATION

### Violations of Exchange Act Rule 13a-14

### (Against Nicholas and Ruehle)

27 | 108.   The Commission realleges and incorporates by reference ¶¶ 1 through

28 | 88 above.

1    109.   Nicholas certified in the quarterly report filed by Broadcom for the

2    quarter ended September 30, 2002, and Ruehle certified in each quarterly and

3    annual report filed by Broadcom from November 2002 through 2005 that, among

4    other things, they reviewed each of these reports and, based on their knowledge,

5    these reports (i) did not contain any untrue statement of material fact or omit to

6    state a material fact necessary to make the statements made, in light of the

7    circumstances under which such statements were made, not misleading and

8    (ii) included financial statements and other financial information which fairly

9    presented, in all material respects, Broadcom's financial condition, results of

10   operations and cash flows.

11    110.   By engaging in the conduct alleged above, Nicholas and Ruehle

12   violated, and unless restrained and enjoined will continue to violate, Exchange Act

13   Rule 13a-14, 17 C.F.R. § 240.13a-14.

14                        **EIGHTH CLAIM FOR RELIEF**

15    **EQUITY BENEFICIAL OWNERSHIP REPORTING VIOLATION**

16   **Violations of Section 16(a) of the Exchange Act and Rule 16a-3 thereunder**

17                          **(Against Ruehle and Dull)**

18    111.   The Commission realleges and incorporates by reference ¶¶ 1 through

19   88 above.

20    112.   Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Rule 16a-

21   3 thereunder, 17 C.F.R. § 240.16a-3, require officers, directors and beneficial

22   owners of more than ten percent of any class of equity security registered pursuant

23   to Section 12 of the Exchange Act, 15 U.S.C. § 78l, to file periodic reports

24   disclosing any change of beneficial ownership of those securities.

25    113.   Ruehle and Dull failed to accurately report changes of beneficial

26   ownership of their Broadcom securities by filing Forms 5 with the Commission

27   that contained false or misleading statements with regard to their options' grant

28   dates, expiration dates, and exercise prices.

1    114.   By engaging in the conduct alleged above, Ruehle and Dull violated,

2  and unless restrained and enjoined will continue to violate, Section 16(a) of the

3  Exchange Act, 15 U.S.C. § 78p(a), and Rule 16a-3 thereunder, 17 C.F.R. §

4  240.16a-3.

5                    **NINETH CLAIM FOR RELIEF**

6              **VIOLATIONS OF COMMISSION PERIODIC**

7                **REPORTING REQUIREMENTS**

8    **Aiding and Abetting Violations of Section 13(a) of the Exchange Act**

9         **and Rules 12b-20, 13a-1, and 13a-13 thereunder**

10                   **(Against All Defendants)**

11    115.   The Commission realleges and incorporates by reference ¶¶ 1 through

12  88 above.

13    116.   Broadcom violated Section 13(a) of the Exchange Act, 15 U.S.C. §

14  78m(a), and Rules 12b-20, 13a-1, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-

15  20, 240.13a-1, and 240.13a-13, by filing with the Commission materially false and

16  misleading periodic reports, including annual and quarterly reports on Forms 10-K

17  and 10-Q for the fiscal years from 1998 through 2005.

18    117.   Nicholas, Samueli, Ruehle, and Dull knowingly provided substantial

19  assistance to Broadcom's violation of Section 13(a) of the Exchange Act, 15

20  U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13 thereunder, 17 C.F.R. §§

21  240.12b-20, 240.13a-1, and 240.13a-13.

22    118.   By engaging in the conduct described above, Nicholas, Samueli,

23  Ruehle, and Dull aided and abetted Broadcom's violations, and unless restrained

24  and enjoined will continue to aid and abet violations, of Section 13(a) of the

25  Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13

26  thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13.

27

28

## TENTH CLAIM FOR RELIEF

### VIOLATIONS OF COMMISSION PERIODIC

### REPORTING REQUIREMENT

### Aiding and Abetting Violations of Exchange Act Rule 13a-11

### (Against Ruehle and Dull)

119.    The Commission realleges and incorporates by reference ¶¶ 1 through 88 above.

120.    Broadcom violated Rule 13a-11 promulgated under the Exchange Act, 17 C.F.R. § 240.13a-11, by filing with the Commission materially false and misleading periodic reports on Form 8-K containing earnings releases from 1998 through 2005.

121.    Ruehle and Dull knowingly provided substantial assistance to Broadcom's violations of Exchange Act Rule 13a-11, 17 C.F.R. § 240.13a-11.

122.    By engaging in the conduct described above, Ruehle and Dull aided and abetted Broadcom's violations, and unless restrained and enjoined will continue to aid and abet violations, of Exchange Act Rule 13a-11, 17 C.F.R. § 240.13a-11.

## ELEVENTH CLAIM FOR RELIEF

### RECORD KEEPING VIOLATIONS

### Aiding and Abetting Violations of Section 13(b)(2)(A) of the Exchange Act

### (Against All Defendants)

123.    The Commission realleges and incorporates by reference ¶¶ 1 through 88 above.

124.    Broadcom violated Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A), by failing to make or keep books, records and accounts that in reasonable detail accurately and fairly reflected its transactions and disposition of its assets.

125.    Nicholas, Samueli, Ruehle, and Dull knowingly provided substantial

assistance to Broadcom's violation of Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A).

126.   By engaging in the conduct described above, Nicholas, Samueli, Ruehle, and Dull aided and abetted Broadcom's violations, and unless restrained and enjoined will continue to aid and abet violations, of Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A).

**TWELVETH CLAIM FOR RELIEF**

**INTERNAL CONTROLS VIOLATIONS**

**Violations of Sections 13(b)(2)(B) of the Exchange Act**

**(Against All Defendants)**

127.   The Commission realleges and incorporates by reference ¶¶ 1 through 88 above.

128.   Broadcom violated Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B), by failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain the accountability of assets.

129.   Nicholas, Samueli, Ruehle, and Dull knowingly provided substantial assistance to Broadcom's violation of Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B).

130.   By engaging in the conduct described above, Nicholas, Samueli, Ruehle, and Dull aided and abetted Broadcom's violations, and unless restrained and enjoined will continue to aid and abet violations, of Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B).

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

(a)   Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

1  (b)  Issue judgments, in a form consistent with Rule 65(d) of the Federal
2  Rules of Civil Procedure, permanently enjoining Nicholas, his agents, servants,
3  employees, attorneys, and those persons in active concert or participation with
4  them, who receive actual notice of the order by personal service or otherwise, from
5  violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Sections 10(b),
6  13(b)(5), and 14(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(b)(5), and
7  78n(a), and Rules 10b-5, 13a-14, 13b2-1, 13b2-2, and 14a-9 thereunder, 17 C.F.R.
8  §§ 240.10b-5, 240.13a-14, 240.13b2-1, 240.13b2-2, and 240.14a-9, and from
9  aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of
10  the Exchange Act, 15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B), and
11  Rules 12b-20, 13a-1, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1,
12  and 240.13a-13.
13  (c)  Issue judgments, in a form consistent with Rule 65(d) of the Federal
14  Rules of Civil Procedure, permanently enjoining Samueli, his agents, servants,
15  employees, attorneys, and those persons in active concert or participation with
16  them, who receive actual notice of the order by personal service or otherwise, from
17  violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Sections 10(b)
18  and 13(b)(5) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78m(b)(5), and Rules
19  10b-5 and 13b2-1 thereunder, 17 C.F.R. §§ 240.10b-5 and 240.13b2-1, and from
20  aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of
21  the Exchange Act, 15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B), and
22  Rules 12b-20, 13a-1, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1,
23  and 240.13a-13.
24  (d)  Issue judgments, in a form consistent with Rule 65(d) of the Federal
25  Rules of Civil Procedure, permanently enjoining Ruehle, his agents, servants,
26  employees, attorneys, and those persons in active concert or participation with
27  them, who receive actual notice of the order by personal service or otherwise, from
28  violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Sections 10(b),

1   13(b)(5), 14(a), and 16(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(b)(5),

2   78n(a), and 78p(a), and Rules 10b-5, 13a-14, 13b2-1, 13b2-2, 14a-9, and 16a-3

3   thereunder, 17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, 240.13b2-2,

4   240.14a-9, and 240.16a-3, and from aiding and abetting violations of Sections

5   13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(a),

6   78m(b)(2)(A), and 78m(b)(2)(B), and Rules 12b-20, 13a-1, 13a-11, and 13a-13

7   thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13.

8          (e)     Issue judgments, in a form consistent with Rule 65(d) of the Federal

9   Rules of Civil Procedure, permanently enjoining Dull, his agents, servants,

10   employees, attorneys, and those persons in active concert or participation with

11   them, who receive actual notice of the order by personal service or otherwise, from

12   violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Sections 10(b),

13   13(b)(5), 14(a), and 16(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(b)(5),

14   78n(a), and 78p(a), and Rules 10b-5, 13b2-1, 14a-9, and 16a-3 thereunder, 17

15   C.F.R. §§ 240.10b-5, 240.13b2-1, 240.14a-9, and 240.16a-3, and from aiding and

16   abetting violations of Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the

17   Exchange Act, 15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B), and

18   Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 thereunder, 17 C.F.R. §§ 240.10b-

19   5, 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13.

20          (f)     Enter an order, pursuant to Section 20(e) of the Securities Act, 15

21   U.S.C. § 77t(e), and/or Section 21(d)(2) of the Exchange Act, 15 U.S.C.

22   § 78u(d)(2), prohibiting Nicholas, Samueli, Ruehle, and Dull from acting as an

23   officer or director of any issuer that has a class of securities registered pursuant to

24   Section 12 of the Exchange Act, 15 U.S.C. § 78*l*, or that is required to file reports

25   pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

26          (g)     Order Ruehle and Dull to disgorge all ill-gotten gains from their

27   illegal conduct, together with prejudgment interest thereon.

28          (h)     Order Nicholas, Samueli, Ruehle, and Dull to pay civil penalties

1  pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and/or Section

2  21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

3        (i)     Order Nicholas and Ruehle to repay bonuses and stock sale profits

4  pursuant to Section 304 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7243.

5        (j)     Retain jurisdiction of this action in accordance with the principles of

6  equity and the Federal Rules of Civil Procedure in order to implement and carry

7  out the terms of all orders and decrees that may be entered, or to entertain any

8  suitable application or motion for additional relief within the jurisdiction of this

9  Court.

10        (k)    Grant such other and further relief as this Court may determine to be

11  just and necessary.

12  DATED:  May 13, 2008

                                    JUNLING MA
                                    Attorney for Plaintiff
                                    Securities and Exchange Commission